## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **M. RAE, INC., d/b/a FENICCI'S OF HERSHEY, PORTABELLA'S INC., d/b/a RIVER HOUSE BAR & GRILL, and HERSHEY INDEPENDENT RESTAURANT ASSOCIATION,** | : : : : : : | **CIVIL ACTION NO. 1:20-CV-2366** **(Judge Conner)** |
| **Plaintiffs** | : : | |
| **v.** | : : | |
| **THOMAS W. WOLF, in his official capacity as Governor of the Commonwealth of Pennsylvania, and RACHEL LEVINE, MD, in her official capacity as Secretary of the Pennsylvania Department of Health,** | : : : : : : : : | |
| **Defendants** | : | |

## MEMORANDUM

On December 10, 2020, Governor Tom Wolf and Secretary of Health Rachel Levine issued limited-time mitigation orders in attempt to stem the rising tide of COVID-19[1] cases and hospitalizations in the Commonwealth of Pennsylvania. Among other things, those orders prohibit indoor dining at businesses in the retail food services industry through January 4, 2021. (See Doc. 1-2 at 3; Doc. 1-3 at 3).

---

[1] The COVID-19 virus is also known as "severe acute respiratory syndrome coronavirus 2" and "SARS-CoV-2." *Naming the Coronavirus Disease (COVID-19) and the Virus that Causes It*, WORLD HEALTH ORG., https://www.who. int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited Dec. 23, 2020). We refer to the virus herein as "the COVID-19 virus" and to the disease it causes as "COVID-19."

Plaintiffs are two local restaurants and a nonprofit restaurant association affected by defendants' limited-time mitigation orders.  Relevant here, plaintiffs contend that, by temporarily suspending indoor dining but allowing other indoor retail businesses to remain open, the orders violate their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Four days ago, plaintiffs filed an emergency motion for temporary restraining order and preliminary injunction, asking the court to immediately halt enforcement of the indoor-dining ban.  For the reasons that follow, we will deny plaintiffs' motion.

## I.   <u>Findings of Fact</u>

The COVID-19 virus has caused a global pandemic of unprecedented scale. The United States Centers for Disease Control and Prevention ("CDC") reported the first travel-related case of the COVID-19 virus in the United States in January 2020.[2]  By January 30, the CDC had confirmed the first instance of person-to-person spread in the country.[3]  On March 6, with 233 confirmed or presumed positive cases in the United States and two presumed positive cases in Pennsylvania, Governor

---

[2] <u>See</u> *First Travel-Related Case of 2019 Novel Coronavirus Detected in United States*, CTRS. FOR DISEASE CONTROL AND PREVENTION ("CDC") (Jan. 21, 2020), https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html.

[3] <u>See</u> *CDC Confirms Person-to-Person Spread of New Coronavirus in United States*, CDC (Jan. 30, 2020), https://www.cdc.gov/media/releases/2020/p0130-coronavirus-spread.html (last reviewed Jan. 30, 2020).

Wolf declared a state of emergency in the Commonwealth.[4]  The state of emergency

has since been extended three times, most recently one month ago.[5]

Mitigation measures quickly followed the March 6 declaration.  On March

13, Governor Wolf announced the temporary closure of all K-12 schools in the

Commonwealth.[6]  Six days later, Governor Wolf issued an executive order closing

all businesses designated "non-life-sustaining."[7]  With respect to restaurants and

bars, the order provided that "[b]usinesses that offer carry-out, delivery, and drive-

through food and beverage service may continue, so long as social distancing and

other mitigation measures are employed."[8]  By April 1, each of the Commonwealth's

---

[4] See Proclamation of Disaster Emergency, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (Mar. 6, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf.

[5] See Amendment to Proclamation of Disaster Emergency, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (June 3, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/06/20200603-TWW-amendment-to-COVID-disaster-emergency-proclamation.pdf; Amendment to Proclamation of Disaster Emergency, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (Aug. 31, 2020), https://www.pema.pa.gov/Governor-Proclamations/Documents/Amendment-COVID19-Disaster-Emergency-083120.pdf; Amendment to Proclamation of Disaster Emergency, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (Nov. 24, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/11/20201124-TWW-3rd-Amendment-COVID-19-Proclamation.pdf.

[6] See Governor Wolf Announces Closure of Pennsylvania Schools, GOVERNOR TOM WOLF (Mar. 13, 2020), https://www.governor.pa.gov/newsroom/governor-wolf-announces-closure-of-pennsylvania-schools/#:~:text=Today%2C%20Governor%20Tom%20Wolf%20announced,gather%20input%20on%20this%20decision.

[7] See Order of the Governor of the Commonwealth of Pennsylvania Regarding the Closure of All Businesses that Are Not Life Sustaining, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (Mar. 19, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

[8] Id. at 2.

67 counties were under a gubernatorial stay-at-home order.[9]  On April 9, the Governor extended the K-12 school closure through the remainder of the academic year.[10]

As the initial wave of COVID-19 cases stabilized, Governor Wolf began reopening of the state.  The reopening process saw counties progress through "red," "yellow," and "green" phases, with the red phase being the most restrictive, and the green phase being the least restrictive.[11]  Restrictions on indoor dining were lessened as well, with restaurants in green-phase counties permitted to operate at up to 50 percent of the maximum capacity stated on their certificate of occupancy, so long as they complied with defendants' mitigation guidance.[12]  By July 3, every county in the Commonwealth had moved to the green phase of reopening.[13]

---

[9] See Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay At Home, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (Apr. 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[10] See Governor Wolf Extends School Closure for Remainder of Academic Year, GOVERNOR TOM WOLF (Apr. 9, 2020), https://www.governor.pa.gov/newsroom/governor-wolf-extends-school-closure-for-remainder-of-academic-year/#:~:text=Governor%20Wolf%20Extends%20School%20Closure%20for%20Remainder%20of%20Academic%20Year,-April%2009%2C%202020&text=Continuing%20his%20efforts%20to%20protect,the%202019%2D20%20academic%20year.

[11] See, e.g., Gov. Wolf Announces Reopening of 24 Counties Beginning May 8, GOVERNOR TOM WOLF (May 1, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-announces-reopening-of-24-counties-beginning-may-8/.

[12] See Order of the Governor of the Commonwealth of Pennsylvania for the Continued Reopening of the Commonwealth, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (May 29, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/05/20200527-TWW-green-phase-order.pdf.

[13] See Gov. Wolf: Last PA County Will Move to Green on July 3, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (June 26, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-last-pa-county-will-move-to-green-on-july-3/#:~:text=Governor%20Tom%20Wolf%20announced%20today,Wolf%20said.

Following an "unsettling climb in new COVID-19 cases" in early summer, Governor Wolf issued a "targeted mitigation" order on July 15.[14]  Among other things, this order reduced capacity at bars and indoor-dining establishments to 25 percent, reiterated physical distancing and mask mandates, and imposed certain restrictions on alcohol sales.[15]  Two months later, on September 17, Governor Wolf amended his July 15 order to allow restaurants and bars to return to 50 percent capacity if they enrolled in and complied with the Commonwealth's "Open & Certified Pennsylvania" program, self-certifying their compliance with masking, physical-distancing, and digital-menu requirements.[16]  In announcing the Open & Certified Pennsylvania program, Governor Wolf "recognize[d] that this pandemic has taken a significant toll on the food services industry, so we must balance public health and economic recovery."[17]

---

[14] See Order of the Governor of the Commonwealth of Pennsylvania Directing Targeted Mitigation Measures, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (June 15, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/07/20200715-TWW-targeted-mitigation-order.pdf.

[15] Id. at 2-3.

[16] See Amendment to the Order of the Governor of the Commonwealth of Pennsylvania Directing Targeted Mitigation Measures, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (Sept. 17, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/09/20200917-TWW-amendment-to-targeted-mitigation-order.pdf; see also Open & Certified Pennsylvania, COMMONWEALTH OF PA., https://www.pa.gov/covid/open-and-certified-pennsylvania/ (last visited Dec. 23, 2020).

[17] See Wolf Administration Signs Orders that Restaurants May Increase Indoor Occupancy to 50 Percent, GOVERNOR TOM WOLF (Sept. 17, 2020), https://www.governor.pa.gov/newsroom/wolf-administration-signs-orders-that-restaurants-may-increase-indoor-occupancy-to-50-percent/.

Since September, the nation has again experienced an alarming spike in COVID-19 cases and hospitalizations.[18] The United States and the Commonwealth each saw record-breaking spikes in daily case numbers throughout the fall.[19] As a result, Governor Wolf and Secretary Levine again took a variety of actions, including imposing a temporary ban on alcohol sales on November 25, the night before Thanksgiving and a popular evening for bars, beginning at 5:00 p.m. and expiring at 8:00 a.m. on November 26.[20]

Two weeks later, Governor Wolf and Secretary Levine issued the limited-time mitigation orders which are the subject of the instant action. Both orders found that, "despite all efforts taken to date, the pandemic continues to spread, and taking action to prevent that spread while continuing to allow for necessary resumption of economic and social activity requires the Commonwealth to take steps to minimize the danger to Pennsylvanians as a result of that activity." (Doc. 1-2 at 1; see Doc. 1-3 at 1). At the time the orders were issued, the Commonwealth had recorded 457,289 cases in all 67 counties, and 12,010 deaths. (See Doc. 1-2 at 1;

---

[18] See generally *WHO: Coronavirus Disease (COVID-19) Dashboard: United States*, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/us (last visited Dec. 23, 2020).

[19] See id.; see also *COVID-19 Data for Pennsylvania*, PA. DEP'T OF HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Dec. 23, 2020) (scroll to "Daily COVID-19 cases" chart).

[20] See Order of the Governor of the Commonwealth of Pennsylvania for Mitigation Relating to Businesses in the Retail Food Services Industry for November 25, 2020, COMMONWEALTH OF PA., OFFICE OF THE GOVERNOR (Nov. 23, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/11/20201123-TWW-retail-food-services-mitigation-order.pdf; see also *Wolf Shuts Bars on Thanksgiving Eve to Fight COVID-19 Spread*, ASSOCIATED PRESS (Nov. 23, 2020), https://apnews.com/article/pennsylvania-tom-wolf-coronavirus-pandemic-e368c1185204ae8a3ca854ca826a1439.

Doc. 1-3 at 1).  Secretary Levine's order observed that "case numbers and number of deaths continue to rise, and the Commonwealth has seen record high case counts since the end of November."  (Doc. 1-3 at 1; <u>see</u> Doc. 1-2 at 1).  Both defendants concluded that the limited-time mitigation orders were necessary "to mitigate the imminent spread of the disease, and associated health hazards presented by COVID-19[], and to enforce the protections necessary to support the response of the Commonwealth to the threat of COVID-19."  (Doc. 1-2 at 1; <u>see</u> Doc. 1-3 at 2).

The measures imposed by the limited-time mitigation orders range from restrictions on private gatherings, to capacity limitations for in-person business establishments, to complete closures of other businesses, including but not limited to gyms, fitness facilities, and entertainment venues.  (<u>See</u> Doc. 1-2 at 2-3; Doc. 1-3 at 3-5).  The orders also reinstitute certain restrictions on in-person, indoor-dining establishments.  (<u>See</u> Doc. 1-2 at 3; Doc. 1-3 at 3).  Specifically, Governor Wolf's order states:

> A.   All in-person indoor dining at businesses in the retail food services industry, including, but not limited to, bars, restaurants, breweries, wineries, distilleries, social clubs, and private catered events is prohibited.
>
> B.   Outdoor dining, take-out food service and take-out alcohol sales are permitted and may continue, subject to any limitation or restrictions imposed by Pennsylvania law, or this or any other Order issued by me or by the Secretary of Health.

(Doc. 1-2 at 3).  Secretary Levine's order includes an identical indoor-dining restriction, except the final clause reads: "subject to any limitations or restrictions imposed by Pennsylvania law, or this or any other Order issued by me or by the

Governor." (Doc. 1-3 at 3). The orders took effect at 12:01 a.m. on December 12 and will remain in effect until 8:00 a.m. on January 4, 2021. (Doc. 1-2 at 4; Doc. 1-3 at 5).

As of this writing, the World Health Organization reports 76,858,506 confirmed COVID-19 cases and 1,711,498 deaths worldwide.[21] The CDC reports 18,170,062 cases and 321,734 deaths in the United States.[22] Data published by the Commonwealth's Department of Health reflects that Pennsylvanians account for 581,156 of those cases and 14,442 of those deaths.[23]

## II.   <u>Background</u>

Plaintiffs are two corporations that operate restaurants affected by the limited-time mitigation orders, as well as the Hershey Independent Restaurant Association. (<u>See</u> Doc. 1 ¶¶ 7-14). Plaintiff M. Rae, Inc., does business as Fenicci's of Hershey, a family-owned restaurant located in Hershey, Pennsylvania, and plaintiff Portabella's, Inc., does business as River House Bar & Grill, a restaurant located in Middletown, Pennsylvania. (<u>See</u> <u>id.</u> ¶¶ 7-12). The Hershey Independent Restaurant Association is a nonprofit association headquartered in Hershey, Pennsylvania. (<u>Id.</u> ¶ 13). Its members are indoor-dining establishments, and owners thereof, in the Hershey and Palmyra areas. (<u>Id.</u> ¶ 14).

---

[21] <u>See</u> *WHO Coronavirus Disease (COVID-19) Dashboard*, WORLD HEALTH ORG., https://covid19.who.int/ (last visited Dec. 23, 2020).

[22] <u>See</u> *United States COVID-19 Cases and Deaths by State*, CDC, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Dec. 23, 2020).

[23] <u>See</u> *COVID-19 Data for Pennsylvania*, PA. DEP'T OF HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Dec. 23, 2020).

Plaintiffs initiated this lawsuit on Thursday, December 17, 2020, with the filing of a three-count complaint. Therein, Plaintiffs challenge the indoor-dining prohibition imposed by the limited-time mitigation orders under the Substantive Due Process Clause, the Procedural Due Process Clause, and the Equal Protection Clause. Two days later, on Saturday, December 19, plaintiffs filed an emergency motion for temporary restraining order and preliminary injunction. We immediately convened a telephonic hearing on Monday, December 21,[24] and tasked the parties to file any additional materials for the court's consideration by noon today. The parties commendably complied, supplying the court with helpful briefing and declarations in support of their respective positions. (See Docs. 12-16). The instant motion is now ripe for disposition.

## III.  **Legal Standard**

Federal Rule of Civil Procedure 65 governs the issuance of temporary restraining orders and preliminary injunctions. See FED. R. CIV. P. 65(a), (b). The same four-factor test applies to both types of equitable relief. See Hope v. Warden York Cty. Prison, 972 F.3d 310, 319-20 (3d Cir. 2020).

To obtain a temporary restraining order or preliminary injunction, the movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. See Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant

---

[24] The court reporter has provided the court with a rough transcript of the December 21 hearing. Citations thereto are abbreviated "Hr'g Tr." Pagination of the rough draft may vary from pagination of the official transcript.

must demonstrate that "it can win on the merits." Id.  This showing must be "significantly better than negligible but not necessarily more likely than not." Id. The second factor carries a slightly enhanced burden: the movant must show that it is "more likely than not" to suffer irreparable harm absent the requested relief. Id. Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief. Id. at 176, 179.  The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief. Id. at 179.

## IV.   **Discussion**

Plaintiffs raise three constitutional claims in their complaint, but they limit their request for emergency relief to their claim under the Equal Protection Clause. (See Hr'g Tr. 25:23-26:1; Doc. 4 at 4-11).  Plaintiffs assert that the limited-time mitigation orders single restaurants and bars out for different treatment without adequate justification. (See Doc. 4 at 4-11).  In plaintiffs' view, there is no legitimate reason for suspending indoor dining while allowing other indoor retail businesses to remain open at reduced capacity. (See id.)  Plaintiffs further assert that the orders' temporary indoor-dining prohibition will inflict irreparable harm not only on them, but also on their owners and employees and the restaurant industry as a whole. (See Doc. 3 ¶¶ 5-7; see also Doc. 4 at 11-13).  We address these claims *seriatim*.

A.       **Likelihood of Success on the Merits**

A movant seeking a temporary restraining order or preliminary injunction must "demonstrate that it can win on the merits."  See Reilly, 858 F.3d at 179.  A showing that is "significantly better than negligible but not necessarily more likely than not" is sufficient to obtain preliminary injunctive relief.  See id.  The requisite strength of a claim on the merits depends ultimately on the balance of the harms:  "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."  Id.

Plaintiffs' claims arise under Section 1983 of Title 42 of the United States Code.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  The defendants *sub judice* ostensibly do not dispute that they are state actors.  Our sole inquiry is whether plaintiffs have demonstrated that the limited-time mitigation orders arguably violate their constitutional right to equal protection.

At the outset, we address the parties' dispute concerning the appropriate level of scrutiny to be applied to exercises of the police power in the name of public health during the COVID-19 pandemic.  For many months, the consensus among

federal courts had been that the highly deferential standard of review applied by the United States Supreme Court in Jacobson v. Massachusetts, 197 U.S. 11 (1905), alone governs such challenges.  See Parker v. Wolf, No. 20-CV-1601, ___ F. Supp. 3d ___, 2020 WL 7295831, at *15 n.20 (M.D. Pa. Dec. 11, 2020) (Jones, C.J.) (citing, *inter alia*, *In re* Abbott, 954 F.3d 772, 784 (5th Cir. 2020); Ill. Republican Party v. Pritzker, 973 F.3d 760, 763 (7th Cir. 2020); *In re* Rutledge, 956 F.3d 1018, 1028 (8th Cir. 2020)).

The Court in Jacobson considered a substantive due process challenge to mandatory vaccinations following a smallpox outbreak.  See Jacobson, 197 U.S. at 27-28.  The Court held that, while constitutional rights do not evanesce during a public-health emergency, "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulation, as the safety of the general public may demand." Id. at 29.  The Court concluded that a measure "enacted to protect the public health, the public morals, or the public safety" will be subject to judicial review only if it "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of the rights secured by the fundamental law."  See id. at 31.  The Court closed by underscoring that this deference to the legislative and executive branches is not without limits and that the police power, even in a public-health emergency, could conceivably be exercised in a manner "so arbitrary and oppressive . . . as to justify the interference of the courts."  See id. at 38.

The consensus on Jacobson's application during the pandemic is not unanimous.  Indeed, contrary authority exists within the Third Circuit.  In County of Butler v. Wolf, No. 2:20-CV-677, ___ F. Supp. 3d ___, 2020 WL 5510690 (W.D. Pa.

Sept. 14, 2020), the district court declined to apply the "extraordinary deference" other courts have drawn from Jacobson, noting both the decision's age and the Supreme Court's development of three ordinary tiers of constitutional scrutiny in the time since the case was decided.  See County of Butler, 2020 WL 5510690, at *6-10.  The court instead applied traditional intermediate and rational-basis scrutiny to the constitutional claims before it.  See generally id. at *13-31.

The Supreme Court has not opined directly on Jacobson's continuing viability or its proper role during the COVID-19 pandemic.  Two Justices to date, however, have sharply criticized reliance on Jacobson as the "last word on what the Constitution allows public officials to do during the COVID-19 pandemic."  See Calvary Chapel Dayton Valley v. Sisolak, 591 U.S. ___, 140 S. Ct. 2603, 2608 (2020) (mem.) (Alito, J., dissenting); see also Roman Catholic Diocese of Brooklyn v. Cuomo, No. 20A87, 592 U.S. ___, 141 S. Ct. 63, ___, slip. op. at 10 (mem.) (Gorsuch, J., concurring).  While neither Justice went so far as to suggest that Jacobson has been stripped of all precedential value, both indicated that the decision's broad language should not be divorced from its narrow context and that it would be a "considerable stretch" to treat the deference applied in that case as the answer to all pandemic-related constitutional claims.  See Calvary Chapel, 140 S. Ct. at 2608 (Alito, J., dissenting); see also Roman Catholic Diocese of Brooklyn, slip op. at 10 ("That decision involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction.") (Gorsuch, J., concurring).

The bottom line for our purposes is that <u>Jacobson</u> is controlling precedent until the Supreme Court or Third Circuit Court of Appeals tell us otherwise.  At its core, <u>Jacobson</u> teaches that some "restraint" on individual liberties must be tolerated in the interest of protecting the public health.  <u>See</u> <u>Jacobson</u>, 197 U.S. at 29.  The difficulty is in squaring that deference with the ordinary tiers of scrutiny developed in the 115 years since <u>Jacobson</u> was decided.  That is, does <u>Jacobson</u> simply inform those tiers as modernly understood, or does it entirely displace them where a public-health emergency is concerned?

We need not resolve that difficult question here, because <u>Jacobson</u> is easily reconciled with the rational-basis standard of review that would otherwise apply to plaintiffs' class-of-one claim.  <u>See</u> <u>Roman Catholic Diocese of Brooklyn</u>, slip. op. at 10 (Gorsuch, J., concurring) ("Although <u>Jacobson</u> pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review.").  Whether we apply <u>Jacobson</u>'s "no real or substantial relation" test, <u>see</u> <u>Jacobson</u>, 197 U.S. at 31, or the modern formulation of rational-basis review, <u>see</u> <u>Village of Willowbrook v. Olech</u>,

528 U.S. 562, 564 (2000),[25] plaintiffs have failed to establish a likelihood of success on their equal protection claim.

Plaintiffs aver that the limited-time mitigation orders' distinction between indoor-dining establishments and "other in-person, indoor business establishments" is "arbitrary and irrational." (Doc. 1 ¶ 67). The fatal deficiency in this claim is that there *are* differences—and material ones, from an epidemiological perspective—between a restaurant and, say, a grocery or hardware store. The first should be obvious: you can wear a mask while bagging produce or selecting a paint color, but you cannot wear a mask to eat or drink. (See Hr'g Tr. 19:10-11; Doc. 13 ¶ 17). Plaintiffs' counsel appropriately conceded this point during our telephonic hearing. (See Hr'g Tr. 10:19-11:9). Other differences are perhaps less obvious but just as important: interactions at "other in-person, indoor business establishments"

---

[25] We agree with Justice Gorsuch that Jacobson's analysis resembles modern rational-basis review. When, as here, a plaintiff does not allege that a contested distinction is based on protected classifications such as race, national origin, religion, or gender, their equal protection claim arises under a "class of one" theory subject to rational-basis review. See Village of Willowbrook, 528 U.S. at 564. A class-of-one claim requires the plaintiff to show that they have been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. The test is "very deferential" and "'is met if there is any reasonably conceivable state of facts that could provide a rational basis' for the differing treatment." Newark Cab Ass'n v. City of Newark, 901 F.3d 146, 156 (3d Cir. 2018) (quoting United States v. Walker, 473 F.3d 71, 77 (3d Cir. 2007) (quoting Heller v. Doe, 509 U.S. 312, 320 (1993))). Just as Jacobson did, rational-basis cases recognize that an "asserted goal" may be "so attenuated as to render the distinction arbitrary or irrational." See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985); see also Jacobson, 197 U.S. at 38 (emphasizing that police power even in cases of public-health emergencies could conceivably be exercised in a manner "so arbitrary and oppressive . . . as to justify the interference of the courts"). Plaintiffs' counsel concedes that "in essence, [Jacobson was] applying what is now the rational basis standard." (See Hr'g Tr. 8:1-4).

are often physically distanced and transient, whereas dining, by its nature, involves physically close and sustained interaction.  (See id. at 20:2-9).  Plaintiffs say they "can implement adequate safety precautions, policies[,] and procedures similar to other in-person business establishments that are permitted to continue operating," (Doc. 1 ¶ 36), but they have not explained what protections they could offer that would be at all comparable to masking.  Plaintiffs' belief that there is no material difference between dining and non-dining establishments is simply wrong.

Plaintiffs also challenge defendants' stated justifications for temporarily suspending indoor dining.  On this point, we find that defendants' reasoning is not just rational—it is compelling.  It cannot genuinely be disputed that COVID-19 cases are surging and pushing the Commonwealth's healthcare system to the brink. Indeed, plaintiffs do not contest Governor Wolf's or Secretary Levine's findings that "following an initial curtailing of COVID-19 spread . . . , a second wave of COVID-19 cases began in the summer months," that "despite all efforts taken to date, the pandemic continues to spread," and that "the Commonwealth is now recording daily COVID-19 cases and hospitalizations in greater numbers than at any other time during this pandemic."  (Doc. 1-2 at 1-2; see Doc. 1-3 at 1-2).  And things have only gotten worse.  Current data reflects that the number of positive cases in the Commonwealth has climbed by more than 100,000 since December 10, and more than 2,400 additional Pennsylvanian lives have been lost to COVID-19 since that

time.[26]  While counsel is correct that vaccines have since been approved and are

now being distributed, (see Hr'g Tr. 17:13-19), they will not be widely available for

some time.[27]  We may be rounding the corner, but we are far from being in the clear.

Plaintiffs also offer no meaningful challenge to defendants' conclusions that

masking is an effective mitigation measure and that indoor dining is a higher risk

activity because masks cannot consistently be worn.  (See Doc. 13 ¶¶ 14-17).  The

evidence is on defendants' side here as well.  The COVID-19 virus is "transmitted

predominantly by respiratory droplets generated when people cough, sneeze, sing,

talk, or breathe."[28]  And it is now widely accepted by the scientific community that

masks help contain the virus's spread by reducing transmission of those droplets.[29]

Due to the need to remove masks as well as limited air circulation, indoor dining

creates "a greater exposure to SARS-CoV-2 respiratory droplets" than other indoor

establishments where masks can be consistently worn.  (See Doc. 13 ¶¶ 17-19).  In

fact, a CDC report cited by Secretary Levine in her limited-time mitigation order

---

[26] (Compare Doc. 1-2 at 1 (457,289 cases and 12,010 deaths as of December 10)), with *COVID-19 Data for Pennsylvania*, PA. DEP'T OF HEALTH, https://www. health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (581,156 cases and 14,442 deaths as of today)).

[27] See *Frequently Asked Questions About Vaccination*, CDC, https://www. cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last updated Dec. 20, 2020) (click "When will a COVID-19 vaccine be available in the United States?").

[28] See *Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, CDC (updated Nov. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html; (Doc. 13 ¶ 15).

[29] See generally *Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, CDC (updated Nov. 20, 2020), https://www.cdc.gov/ coronavirus/2019-ncov/more/masking-science-sars-cov2.html; *Coronavirus Disease (COVID-19): Masks*, WORLD HEALTH ORG. (Dec. 1, 2020), https://www.who.int/news-room/q-a-detail/coronavirus-disease-covid-19-masks; (Doc. 13 ¶¶ 14-16).

warns that "[i]ndoor venues, where distancing is not maintained and consistent use of face masks is not possible (e.g., *restaurant dining*), have been identified as particularly high risk scenarios."[30]  And more recent CDC guidance for bars and restaurants lists on-site indoor dining as a "higher risk" activity *even if* capacity is reduced and tables are spaced six feet apart.[31]  Given all of this, we have little difficulty concluding that defendants' decision to enact temporary mitigation measures targeted at indoor-dining establishments was eminently rational.

That leaves us with plaintiffs' remaining claim: that the limited-time mitigation orders, as they pertain to indoor-dining establishments, are flawed because defendants have not established that indoor dining is a "significant mode of possible infection" in the Commonwealth.  (See Doc. 4 at 9-10).  In essence, plaintiffs argue that, without direct evidence that indoor dining has contributed in some "significant" way to the current surge in cases, preventative measures are unnecessary.  (See id.)  According to plaintiffs, it is defendants' burden to answer "[w]hat changed . . . from a medical source standpoint" between their conclusion on November 25, that a temporary ban of alcohol sales would be sufficient to meet public-health needs, and their conclusion on December 10, that a suspension of

---

[30] See Margaret A. Honein, PhD, *et al.*, *Morbidity and Mortality Weekly Report (MMWR): Summary of Guidance for Public Health Strategies to Address High Levels of Community Transmission of SARS-CoV-2 and Related Deaths*, CDC (Dec. 4, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6949e2.htm (emphasis added); (see also Doc. 1-3 at 2).

[31] See *Restaurants and Bars*, CDC (updated Dec. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/business-employers/bars-restaurants.html.

indoor dining was necessary.  (See Doc. 14 at 3).  The answer, of course, is that

everything changed.  As we have explained *passim*, cases across the Commonwealth

were surging at never-before-seen levels, and it was Governor Wolf's and Secretary

Levine's prerogative and duty to act.

Plaintiffs' request for specific and particularized data justifying defendants'

limited-time mitigation orders betrays a fundamental misapprehension of rational-

basis review.  Mathematical precision is simply not required.[32]  See Heller, 509 U.S.

at 321 (quoting Dandridge v. Williams, 397 U.S. 471, 485 (1970)); see also Jacobson,

197 U.S. at 362.  That is, "courts are compelled under rational-basis review to accept

a legislature's generalizations even when there is an imperfect fit between means

and end."  Heller, 509 U.S. at 321.  When analyzing an equal protection claim, we

must be mindful that "[t]he problems of government are practical ones and may

justify, if they do not require, rough accommodations."  Metropolis Theatre Co.

v. Chicago, 228 U.S. 61, 69-70 (1913).  As Chief Justice Roberts observed in May:

> Our Constitution principally entrusts "[t]he health and
> safety of the people" to the politically accountable officials
> of the States "to guard and protect."  When those officials

---

[32] Even if it were, the data arguably support defendants' decision to temporarily suspend indoor dining.  Plaintiffs place much emphasis on defendants' December 7 status update which noted that, of confirmed cases reported between November 22 and November 28, only 241 individuals reported visiting a business establishment in the two weeks preceding symptom onset.  (See Doc. 1-7 at 3).  Notably, only *4.5 percent* of individuals with newly confirmed cases—2,085 of 46,653 people—actually responded to the question about where they had been in the preceding two weeks.  (See id.)  But more importantly, plaintiffs ignore what the statistics say about the types of establishments the responding individuals visited: *48 percent* of those who reported visiting a business had gone to a restaurant.  (See id.)

> "undertake[] to act in areas fraught with medical and
> scientific uncertainties," their latitude "must be especially
> broad."  Where those broad limits are not exceeded, they
> should not be subject to second-guessing by an "unelected
> federal judiciary," which lacks the background, competence,
> and expertise to assess public health and is not accountable
> to the people.

S. Bay United Pentecostal Church v. Newson, 590 U.S. ___, 140 S. Ct. 1613, 1613-14

(2020) (mem.) (Roberts, C.J., concurring) (quoting Jacobson, 197 U.S. at 38; Marshall

v. United States, 414 U.S. 417, 427 (1974); Garcia v. San Antonio Metro. Transp.

Auth., 469 U.S. 528, 545 (1985)).

 We recognize that plaintiffs disagree with defendants' decision to respond to

the current surge of COVID-19 cases by, *inter alia*, temporarily suspending indoor

dining.  But it is an unfortunate reality during this unprecedented global pandemic

that there are no perfect choices; so "imperfect," if properly justified, must suffice.

Cf. Heller, 509 U.S. at 321.  It is for the Commonwealth's public officials—not this or

any court—to determine the most appropriate means by which to meet the current

crisis.  Our only task is to determine whether defendants' differentiation between

indoor-dining establishments and other indoor businesses is sufficiently tethered

to the stated public-health objectives.  We conclude that it is.

 Plaintiffs also argue that defendants' mitigation orders "are not uniformly

enforced."  (Doc. 4 at 6; see Doc. 14 at 8).  Plaintiffs' arguments on this claim are

largely self-defeating.  Plaintiffs protest that "the Pennsylvania Department of

Agriculture has contacted Plaintiffs, *as well as many other restaurants*, to notify

them of their violations of the Limited-Time Mitigation Orders by remaining open

for indoor dining and to threaten forced closure by law enforcement and license

revocation if they do not comply with the Orders." (See Doc. 4 at 10 (emphasis added)). By their own account, plaintiffs are being treated *the same* as similarly situated indoor-dining establishments. To the extent that plaintiffs claim that the Commonwealth is more strictly enforcing mitigation orders against indoor-dining establishments than it has against non-dining establishments, we have already found that those establishments are not similarly situated.

What plaintiffs are protesting, then, is not selective enforcement, but simply enforcement. We offer no comment on the plaintiff restaurants' personal choice to stay open in violation of the limited-time mitigation orders. It is beyond peradventure that the hospitality industry has been devastated by the COVID-19 pandemic. To be sure, the court is sympathetic to the plight of restaurant owners and their employees. But having decided to violate the limited-time mitigation orders, the plaintiff restaurants cannot now cry foul when faced with the known repercussions of that decision.

For all of these reasons, we conclude that plaintiffs have failed to establish a likelihood of success on their Equal Protection claim.

### B.   Irreparable Harm

A plaintiff seeking a temporary restraining order or preliminary injunction must also establish irreparable harm. Irreparable harm is an injury of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole. See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Mere risk of injury is not sufficient to meet this standard. Rather, the moving party

must establish that the harm is imminent and probable.  <u>Anderson</u>, 125 F.3d at 164.

Harm that may be contained effectively only through immediate injunctive relief is

properly deemed "irreparable."  <u>Instant Air Freight</u>, 882 F.2d at 801.  Availability of

money damages will typically "preclude a finding of irreparable harm."  <u>Id.</u> at 177

(citing <u>Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.</u>, 847 F.2d 100, 102 n.3 (3d

Cir. 1988)).

As we have noted, the required showings on irreparable harm and

likelihood of success are correlative: the weaker a plaintiff's merits showing, the

more is required of the showing of irreparable harm, and vice versa.  <u>See</u> <u>Reilly</u>, 858

F.3d at 179 (quoting <u>Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life</u>

<u>Ins. Co.</u>, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).  Given plaintiffs' weak

showing on the merits of their equal protection claim, a particularly compelling

showing of irreparable harm is needed to obtain emergency injunctive relief.

Plaintiffs have not sustained that burden.

Although plaintiffs do not seek monetary damages, much of the harm

articulated in their complaint and supporting declarations is economic in nature

and thus compensable by a remedy at law.  (<u>See</u> Doc. 1 ¶¶ 38-40; Doc. 15 ¶¶ 4-8, 10-

12; Doc. 16 ¶¶ 4-12).  The harms claimed by plaintiffs are, at this point, speculative:

plaintiffs hypothesize, based on past extensions of mitigation orders, that the

"Defendants *could* extend the [limited-time mitigation orders] as they have done

with past COVID-19-related Orders," (Doc. 4 at 3 (emphasis added)), and predict

that their businesses "are likely, at some point, not to survive," (Hr'g Tr. 14:24-9).

While we certainly appreciate that the temporary indoor-dining closures may have

caused the owners of the plaintiff restaurants to experience both economic hardship and mental distress, (see Doc. 15 ¶ 13; Doc. 16 ¶ 13), that cannot alone justify injunctive relief, particularly in the absence of a strong showing on the merits.

The balance of the harms alleged by plaintiffs are not *their* harms.  (See Doc. 15 ¶ 14; Doc. 16 ¶ 14).  We greatly sympathize with the restaurant workers experiencing layoffs and lost wages, particularly during the holiday season.  But plaintiffs in this case must do more than remonstrate generally about harms to the restaurant industry, writ large.  They must show that the orders directly and irreparably harm *them*, and they have not done so.  See Hope, 972 F.3d at 331-32 (holding that district court was required to find "that *each Petitioner* showed they would suffer irreparable harm absent relief" (emphasis added) (citing Reilly, 858 F.3d at 179)).

It also bears noting that the limited-time mitigation orders are both temporary in nature and not as sweeping as plaintiffs portray.  The orders are limited in duration, and we are now past the halfway mark; the orders expire in just 11 days.  (See Doc. 1-2 at 4; Doc. 1-3 at 5).  Nor do the orders effect a "shutdown" of the plaintiff restaurants.  (Cf. Doc. 1 ¶ 44).  Plaintiffs can still operate: the limited-time mitigation orders allow them to offer takeout or outdoor dining as well as takeout alcohol sales.  (See Doc. 1-2 at 3; Doc. 1-3 at 3).  The individual plaintiffs' websites indicate that both offer takeout and delivery options.  See *Menu*, RIVER HOUSE BAR & GRILL, http://riverhouseonline.net/menu/ (last visited Dec. 23, 2020); FENICCI'S OF HERSHEY, https://feniccis.com/ (last visited Dec. 23, 2020).  These may

not be plaintiffs' preferred or most profitable means of doing business, but they can still do business.  Plaintiffs have not shown they are "more likely than not" to suffer irreparable harm in the absence of a temporary restraining order or preliminary injunction.  See Reilly, 858 F.3d at 179.

### C.   Remaining Factors

Because plaintiffs fail to "meet the threshold for the first two 'most critical' factors," they cannot obtain temporary or preliminary injunctive relief.  See id.  But even if we were to reach the remaining factors, they too would support denial of plaintiffs' motion.  The third and fourth factors consider the potential for harm to third parties if relief is granted, and whether the public interest favors injunctive relief.  See id. at 176, 179.  We have acknowledged that restaurant staff may experience financial and other difficulties during the three-week suspension of indoor dining, and we do not discount those hardships.  But just as important is the collective interest of all Pennsylvanians in staying healthy and emerging from this dark and difficult period with as few lives lost as possible.  It is the unenviable task of our public officials to balance these competing interests and determine how best to protect Pennsylvanian lives.

### V.   Conclusion

An extraordinary public-health crisis like the COVID-19 pandemic requires an extraordinary response.  In deciding what that response must be, the executive branch faces a Hobson's Choice: impose restrictions sure to effect economic harm to industries already facing crippling financial difficulties, or set less onerous rules

sure to increase the rate of infections and fatalities attributable to the pandemic. It is a truly awful policy conundrum.

At issue here, defendants' determination that the restaurant industry must yield to the greater concerns of public health is a rational and wholly appropriate policy justification for the limited-time mitigation orders. Yet for those whose livelihoods depend upon in-person food, drink, and entertainment, a rational policy decision does precious little to pay their rents or mortgages or to put food on their tables. Some establishments have closed permanently, and others may not survive the latest restrictions. In light of the conclusions set forth herein, we cannot provide any remedial assistance, and we must defer to other branches of government to address the restaurant industry losses. We find only that the restrictions responsible for those losses are not violative of constitutional principles.

Accordingly, the court must deny plaintiffs' emergency motion (Doc. 3) for temporary restraining order and preliminary injunction. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:        December 23, 2020